## Illinois Steel Company v. Clinton B. Saylor, Administrator.

### Gen. No. 4,648.

1. ASSUMED RISK—*what within doctrine of.* Employes assume the natural risks of the business they are engaged in, after the master has exercised due care to furnish them a reasonably safe place in which to work.

2. MOTION FOR NEW TRIAL—*effect of filing written.* A written motion for a new trial specifying the grounds on which it is made, waives all other grounds.

Action on the case. Appeal from the Circuit Court of Will county; the Hon. ALBERT O. MARSHALL, Judge, presiding. Heard in this court at the April term, 1906. Affirmed. Opinion filed October 16, 1906.

JOHN H. GARNSEY, for appellant; K. K. KNAPP, of counsel.

W. W. STEVENS and P. SHUTTS, for appellee.

MR. JUSTICE THOMPSON delivered the opinion of the court.

This is an action on the case brought by Clinton B. Saylor, administrator, against appellant, to recover damages for the loss of support by the mother and brothers of Charles J. Saylor who it is alleged lost his life while working about appellant's blast furnace number 3, December 13, 1903.

The declaration contains two counts: The first alleges "that the defendant carelessly and negligently failed to keep the said furnace in safe condition and repair," and that by reason thereof a large amount of molten metal escaped from said furnace and was cast upon plaintiff. The second alleges "that defendant carelessly and negligently failed to keep the said furnace in safe condition and repair, but on the contrary then and there carelessly and negligently permitted the said furnace to become defective and unsafe and in bad and dangerous condition."

To this charge of general negligence defendant plead the general issue. There was a verdict and judgment for $5,000, and the defendant appeals.

The proof shows that blast furnace number 3 of the Illinois Steel Company had stood for sixteen or seventeen years, and is composed of the hearth or crucible, the bosh and the stack. The diameter of the hearth is nineteen feet and it is surrounded on the outside by a steel jacket one and one-half inches thick, which starts two feet below the floor level and extends above the floor about four feet. The floor of the hearth within the jacket is of fire brick about two feet thick, and above the floor the steel jacket is lined with fire brick to a thickness of three and one-half feet. Above the hearth is the bosh extending upward about twenty feet and slanting outward. The bosh is built of fire brick, in which are hollow cooling metal plates called bosh plates, in which water circulates. Above the bosh is a steel mantle supported on columns, and upon the mantle is the stack about sixty feet high, built of brick, lined with fire brick. The furnace is about eighty-five feet high,

and is filled from the top. When a cast is made the metal is run out through an aperture a little above the hearth, which is at other times plugged with clay. The heat in the furnace is from 2,600 to 3,000 degrees. In operating the furnace the aim is to keep the metal and slag below the level of the tapping hole. The air blast is forced into the furnace through tuyeres about ten feet above the hearth, the melting point being above them. Water is kept circulating in the bosh plates and running over the outside of the band around the hearth.

Charles J. Saylor, the deceased, was a pipe fitter's helper or pipe fitter, and his business was fitting up water pipes and tuyeres, and helping put them in under the direction of the foreman in charge of the furnace, his duties requiring him to be close to the furnace and all around it during the hours he was at work, to see if there were leaks of water or steam, and if there was anything wrong with the piping to attend to it, under instructions. He had worked for the company at this work about nine years, and was under a foreman, Tim McCarthy. The deceased had no control or management of the furnace, but was there to do what he was told to do. It appears from the evidence that Saylor had nothing to do with the agency that caused an explosion resulting in his death. There was a trench running around the hearth into which the water ran and thence into a sewer. On the 13th of December ten or fifteen tons of molten metal broke out of the furnace, either through the lower part of the jacket and the hearth or down through the hearth and up through the ground, and, coming in contact with water, exploded. Saylor was seen around the furnace but a few moments before, attending to his duties, and a few minutes after the explosion he was found eight or ten feet from the furnace dead and burned with a piece of iron roofing laying over him that fell from the roof because of the shock of the explosion.

The principal question for this court to pass upon is whether the proofs show that this accident was due to any negligence of the company, or whether it was an accident which could not be foreseen or provided against. It is a close question and one upon which this court is not unanimous.

Counsel for appellant say that the deceased may have died of heart disease. The cause of his death was a question for the jury to decide from the evidence, and it was found that he died because of the iron breaking out from the furnace, because of appellant's negligence. The proof shows that although the bottom of the hearth is originally made of fire brick, yet by "chemical action" with the great heat and the blast, the brick gradually disappears and is blown off with the slag or loses its character as brick and becomes fused with iron, and a very hard substance called "salamander" takes its place. This salamander is a mixture of iron, graphite, silica and other elements. The evidence shows that the average life of the lining of a hearth is two years. About a year before the accident this furnace had been cooled, and the lining taken out above the bottom lining of the hearth, and the sides relined from the floor up. The floor had been cleaned off and the rough places filled with crushed granite and ganister. The floor was not taken up and no witness in the case seems to have known how long it had been there, although several of them had worked there many years. When the furnace was relined, no care was taken to see how thick the bottom of the hearth was, or whether it was brick or salamander. The salamander was not taken up nor its condition examined beneath the surface, nor had it been examined since such repairing, nor for a long time before. The officers and foreman who were in charge of the furnace at the time of the accident did not seem to know how deep or thick the salamander was, nor what its condition was. The evidence showed that although salamander is extremely

hard, yet by the action of the blast when casting, which is done four times a day, it becomes greatly worn.

Employes assume the natural risks of the business they are engaged in, after the master has exercised due care to furnish them a reasonably safe place in which to work. The lives of the employes depended upon appellant's properly inspecting and keeping the floor and its connection with the jacket and lining of the hearth in good repair, and in such condition that the molten material forced by the pressure from above and the blast could not find its way through. Saylor, the deceased, had no control over the furnace in any way and no means of obtaining any knowledge as to the condition of any portion of the interior, or as to its safety.

Nothing was done in this case to ascertain how this metal got out, although several tons of it escaped into the ground and was not found, the evidence showing that when such break-outs occur below the ground the metal itself repairs the break. It may have gone through the salamander, or an aperture may have been created between the salamander and the brick lining and the molten mass been forced through that by the great pressure. It did escape and not through the part of the furnace repaired a year before, as that would have brought it through the brick and jacket above the floor. The trouble was caused by the molten metal breaking through the under part of the furnace, and the proof tended to show and did convince the jury that the break-out arose from a want of reasonable care on the part of appellant. While the break-outs do not occur often, yet when they do occur they are serious matters, and hence the greater need of inspection and precaution. We think the jury were justified in their finding because of the failure of appellant to find out the depth or thickness of the salamander and the condition under and around it, either when the lining of the furnace was rebuilt or subsequently.

No question has been raised upon the admission or rejection of evidence, nor any error assigned upon any ruling of the trial court upon any question of evidence.

Appellant has argued that the second instruction given for appellee is erroneous. In the trial court a written motion for a new trial was made by appellant, specifying the grounds upon which it relied, and no objection is therein made as to the giving of any instructions on the part of appellee. When appellant filed its motion for a new trial specifying the grounds on which it relied, it waived all other grounds, and cannot raise them for the first time in this court. Practice Act, Sec. 56, S. & C.; Central Union Building Co. v. Kolander, 212 Ill. 27; I. C. R. R. Co. v. Johnson, 191 Ill. 594; Consolidated Coal Co. v. Schaefer, 135 Ill. 210; Enright v. Gibson, 119 Ill. App. 411; Richardson v. Benes, 115 Ill. App. 532.

The appellant has not included in its assignment of error in this court any assignment raising any question upon any instructions given on behalf of appellee, and there is no question before this court in that regard.

Appellant complains of the remarks of counsel in the closing argument before the jury, and the ruling of the court thereon. We do not think there was anything harmful in what was said; they were in a vein rather complimentary to opposing counsel and of a facetious nature, and there being no claim that the verdict is excessive, if appellee was entitled to a verdict at all, we conclude there was no error in the remarks or in the court's ruling thereon.

We conclude the court properly refused the peremptory instruction asked by appellant and that there is evidence to sustain the verdict, and the judgment is therefore affirmed.

*Affirmed.*